IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

UNITED STATES OF AMERICA

v.  CRIMINAL NO. 2:18cr30

DUANE DEQUAN JONES,

Defendant.

## MEMORANDUM OPINION

On April 13, 2018, the parties appeared before the Court on Duane Dequan Jones' ("Defendant Jones") Motion to Suppress. ECF No. 21. At that time, Defendant Jones stood charged with five counts of a thirteen-count criminal indictment, which included several firearm and drug offenses.[1] ECF No. 1. In his motion, Defendant Jones moved to suppress all of the evidence recovered from a search of Defendant Jones' van on October 19, 2017, including a handgun, methamphetamine, and marijuana, on the grounds that law enforcement's detention of Defendant Jones and subsequent search of his van on that date were unlawful. At the conclusion of the hearing, the Court **DENIED** Defendant Jones' Motion to Suppress. ECF No. 21. This Opinion sets forth the Court's reasons for its decision.

I.  FACTUAL BACKGROUND

In June, 2017, the Virginia Beach Police Department ("VBPD") and the federal Drug Enforcement Agency ("DEA") began a narcotics investigation into Defendant Jones' co-

---

[1] On April 18, 2018, after the hearing on Defendant Jones' Motion to Suppress, the charges against Defendant Jones in the original indictment were dismissed after a federal grand jury named Defendant Jones in a superseding criminal indictment charging him with eleven counts, including: Drug Trafficking Conspiracy (Count 1), Conspiracy to Use and Carry Firearms (Count 2), Conspiracy by Convicted Felon to Possess Firearms and Ammunition (Count 3), Possession with Intent to Distribute Controlled Substance (Counts 4–7), Carrying Firearm During and in Relation to a Drug Trafficking Crime (Counts 8–9), and Possession of Firearm and Ammunition by Convicted Felon (Counts 10–11). ECF No. 42.

1

defendant, Michael David Smith ("Smith"), after receiving information from a confidential informant that Smith was selling cocaine and marijuana from a recording studio located at 156 Newtown Road, Suite 4A, in Virginia Beach, Virginia ("Newtown Studio"). As part of the investigation, the lead detective, Detective Brent Riddick of VBPD Special Investigations, began orchestrating controlled cocaine purchases between the confidential informant ("CI") and Smith. Four such purchases occurred between June 29, 2017, and September 9, 2017, all of which took place at the Newtown Studio.

### A. Law Enforcement Discovered Smith's Heroin Supplier.

On September 9, 2017, at Detective Riddick's instruction, the CI asked Smith about purchasing heroin. Smith confirmed that he had a heroin supplier, at which time the CI arranged to buy heroin from Smith. A few weeks later, during this first controlled heroin purchase, Smith's apparent heroin supplier arrived at the Newtown Studio in a maroon Chevy Tahoe, which had a license plate number registered to Darien Everette ("Everette").

Detective Riddick then orchestrated a second controlled heroin purchase, which occurred the next day. During this transaction, Smith's supplier arrived at the Newtown Studio in the same Chevy Tahoe, and he was accompanied by an unknown male. Law enforcement positively identified the supplier as Everette. Using mobile surveillance, law enforcement soon located Everette's residence on Geneva Avenue in Chesapeake, Virginia ("Geneva Residence").

Detective Riddick then orchestrated two additional controlled heroin purchases from Smith. These purchases occurred at the Newtown Studio on October 6, 2017, and on October 12, 2017. Just prior to each of these transactions, law enforcement watched Everette leave his Geneva Residence, drive to the Newtown Studio in his Chevy Tahoe, and leave the Newtown Studio after a short time. On both occasions, Everette was accompanied by an unknown male. On October 6, 2017, the unknown male drove separately in a Chevy Silverado pickup truck

2

following behind Everette. On October 12, 2017, a different unknown male rode as a passenger in Everette's Chevy Tahoe while Everette drove. On both occasions, once Everette had left the Newtown Studio, Smith signaled to the CI that the heroin was ready for purchase.

### B. Law Enforcement Planned a Takedown of the Newtown Studio.

Just after noon on October 19, 2017, Detective Riddick secured the following four warrants from the Virginia Beach Circuit Court: (1) a search warrant for the Newtown Studio; (2) a search warrant for the Geneva Residence; (3) an arrest warrant for Smith; and (4) an arrest warrant for Everette. The two search warrants authorized a search for heroin and other items related to drug activity.

With these warrants, law enforcement planned simultaneous takedown operations of the Newtown Studio and the Geneva Residence to occur that same day, October 19, 2017. The plan was as follows: The CI would arrange a controlled heroin purchase from Smith to occur that afternoon. A mobile surveillance team would track Everette's movements, and Special Weapons and Tactics ("SWAT") teams would be located at the Newtown Studio and the Geneva Residence to execute the takedown operations. One SWAT team would arrest Everette when he arrived at the Newtown Studio to deliver the heroin supply to Smith. A second team would enter the Newtown Studio from the front entrance once Everette was secured. A third team would secure the rear entrance to the studio while the second team executed the initial sweep of the studio. Finally, a separate SWAT team would search the Geneva Residence at the same time as the studio. When this operation was planned, Defendant Jones was not a target of the investigation or known to the investigators.

### C. Defendant Jones Accompanied Everette on the Day of the Takedown.

In the early afternoon on October 19, 2017, the day of the scheduled takedown, law enforcement surveillance determined that Everette had entered a Waffle House restaurant in

3

Chesapeake. An undercover DEA task force agent arrived at the Waffle House sometime thereafter and viewed Everette dining with an unknown male, later identified as Defendant Jones. Everette and the then-unknown male left the restaurant together at around 3:00 p.m. and got into separate vehicles in the parking lot. Everette got into his Chevy Tahoe, and the then-unknown male got into a red minivan. The undercover agent, in his own vehicle, then followed Everette and saw the red minivan follow closely behind Everette's Tahoe until both vehicles arrived at the Geneva Residence. Everette and the then-unknown male in the red minivan parked in the driveway of the Geneva Residence, and they entered the residence. A short while later, they exited the Geneva Residence at the same time and got into their respective vehicles. The two vehicles then caravanned from the Geneva Residence in Chesapeake to the Newtown Studio in Virginia Beach. Their total journey together spanned about twenty miles.

Meanwhile, Detective Riddick was working to identify Everette's unknown companion. Just after 3:00 p.m., Detective Riddick ran the license plate number of the red minivan through a police dispatcher who determined that the van was registered to Defendant Jones and that Defendant Jones' license was suspended. Detective Riddick then ran a report for Defendant Jones in LInX, a law enforcement data-sharing program, which generated an arrest record and photograph of Defendant Jones. The arrest record reflected that Defendant Jones had been arrested on five different occasions for ten drug-related offenses.[2] The undercover agent from the Waffle House then confirmed that the LInX photograph of Defendant Jones was the same individual who had dined with Everette at the Waffle House.

---

[2] At the suppression hearing, Detective Riddick testified that the LInX report showed approximately ten drug-related arrests, some of which occurred on the same date. However, the report shows that there were five separate drug-related arrests, two of which were for multiple drug-related offenses. See ECF No. 27-14 at 3-5.

Detective Riddick then briefed the studio SWAT officers on the situation and instructed them to detain Defendant Jones during the takedown. As a result, Sergeant J. Minehan, who prepared the tactical operations plan for the takedown, adjusted the plan to account for Defendant Jones' presence. Specifically, he instructed Officer J. Trout, who was originally assigned to Everette's arrest team, to detain Defendant Jones during the takedown.

### D. Defendant Jones' Detention and Search of His Vehicle.

Everette and Defendant Jones arrived at the Newtown Studio in their separate vehicles at 5:45 p.m. Upon arriving, they each backed into adjacent parking spaces in front of the studio. The Newtown Studio is located on the second floor of a three-story office building comprised of approximately six to eight suites. The studio is equipped with video surveillance of the parking lot. To access the studio from the front, there are two sets of stairs, one on the left and one on the right, both of which have ramps that lead up to a steel-framed, double-paned glass door on the second floor. The glass door opens to a small vestibule where the studio's front door is located. To access the studio from the back, there is a ground-level door, which opens to an interior set of stairs. The parking area in the front of the studio is comprised of a single row of spaces extending the length of the office building, and it is shared by the various businesses in the office building. At the time Everette and Defendant Jones parked there on the day of the scheduled takedown, Defendant Jones' minivan was located approximately 35 feet from the sidewalk leading up to the Newtown Studio entrance and approximately 100 feet from the studio's front door. Everette's Chevy Tahoe was parked between Defendant Jones' minivan and the studio entrance.

Within moments of arriving at the Newtown Studio, Everette exited his vehicle and began walking toward the studio entrance. Defendant Jones remained in his red minivan. After deploying a flash bang device, the SWAT team moved in on Everette to arrest him while Officer

Trout peeled off toward Defendant Jones' minivan with his weapon pointed at Defendant Jones. Officer Trout yelled for Defendant Jones to put his hands in the air, and Defendant Jones complied. Defendant Jones was detained inside his minivan for a few minutes until two additional SWAT officers were able to assist Officer Trout. At that time, Officer Trout instructed Defendant Jones to exit the vehicle and get down on the ground. Defendant Jones complied, and another officer placed Defendant Jones in handcuffs.

At approximately 5:51 p.m., within minutes of Everette's arrest, SWAT officers initiated a protective sweep of the Newtown Studio. This sweep lasted between ten and fifteen minutes before the investigative search of the premises began. Upon receiving the "all clear" signal, Detective D. Kagel of VPBD Special Investigations, who was positioned across the street from the Newtown Studio, drove over to the studio with his narcotics K-9 named "Rex" to assist with the investigative search.[3] While walking toward the studio, Detective Kagel was intercepted by Detective Riddick who requested a K-9 screen of Defendant Jones' minivan. Detective Kagel then retrieved Rex. Rex performed a sniff screen of the minivan and alerted to the presence of drugs at 6:06 p.m. The officers then searched Defendant Jones' minivan and recovered a backpack next to the sliding door on the passenger side. The backpack contained a loaded handgun, methamphetamine, and marijuana. The entire investigative search of the Newtown Studio lasted between two and three hours.

## II. DISCUSSION

Defendant Jones argues that all evidence seized from his minivan on October 19, 2017, should be suppressed because it was obtained as a result of an unreasonable seizure of his person and an unlawful search of his minivan. There are two main issues before the Court: (1) whether

---

[3] Detective Kagel was assigned to assist with the search of the studio without the assistance of Rex. Detective Riddick testified that Rex was only on site in case the officers needed to screen vehicles or other spaces outside the scope of the search warrant.

Defendant Jones' detention was lawful pursuant to Michigan v. Summers, 452 U.S. 692 (1981), which permits officers to detain occupants of the premises during the execution of a search warrant on such premises ("the Summers rule") and, if not, (2) whether reasonable suspicion justified Defendant Jones' detention as required under Terry v. Ohio, 392 U.S. 1 (1968). The Court addresses each issue in turn.

### A.     The Summers Rule

In Summers, the Supreme Court held that, for Fourth Amendment purposes, a search warrant founded on probable cause "implicitly carries with it the limited authority to detain occupants of the premises while a proper search is conducted." 452 U.S. at 705. In so holding, the Court considered the limited additional invasion of privacy resulting from the detention as well as the law enforcement interests supporting the detention, including: (1) "preventing flight in the event incriminating evidence is found"; (2) "minimizing the risk of harm to the officers"; and (3) facilitating "the orderly completion of the search." Id. at 702–03. With respect to the invasion of privacy, the Court reasoned that detaining an occupant is only "an incremental intrusion on personal liberty when the search of a home has been authorized by a valid warrant." Id. at 703. The Court also noted that detention in such cases is based on "articulable and individualized suspicion": where a judicial officer has found probable cause to believe that criminal activity is occurring in a home, it is reasonable to suspect that an occupant of that home is involved in such criminal activity. Id. at 703–04.

However, the Supreme Court has clarified that the Summers rule is not an ad hoc test: "it does not depend on 'the quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure.'" Muehler v. Mena, 544 U.S. 93, 98 (2005) (quoting Summers, 452 U.S. at 705 n.19). Nor does it require law enforcement "to have particular suspicion that an individual is involved in criminal activity or poses a specific danger to the officers." Bailey v.

7

United States, 568 U.S. 186, 193 (citing Muehler, 544 U.S. at 98). Rather, an officer's authority to detain an occupant of premises incident to a lawful search of those premises is "categorical." Muehler, 544 U.S. at 98.

In Bailey, the Supreme Court revisited the Summers rule to address the geographical limits of "occupancy" for purposes of the rule. Bailey, 568 U.S. 186. The issue in Bailey was whether a detention incident to a lawful search of an apartment was reasonable when the occupant of such apartment was nearly a mile away from the premises at the time he was detained. Id. at 194. The Court held that it was not. Id. at 201. In considering the rationale for the Summers rule, the Court determined that, as the distance between the occupant and the searched premises grows, the law enforcement interests justifying the detention diminish and the intrusiveness of the seizure increases. Id. at 201. The Court thus concluded that the Summers rule must be spatially constrained to include only the "immediate vicinity" of the premises to be searched where the "occupant poses a real threat to the safe and efficient execution of a search warrant[.]" Id. Although the Bailey Court did not have occasion to further define "immediate vicinity" for this purpose, it provided a list of non-exclusive factors that courts may use to determine this question in closer cases. Id. These factors include (1) whether the search occurred within the lawful limits of the premises; (2) whether the occupant was within the line of sight of his dwelling; and (3) the ease of reentry from the occupant's location. Id.

### B. Defendant Jones Was Lawfully Detained Incident to the Execution of a Search Warrant.

Here, it is undisputed that Defendant Jones was parked outside of the Newtown Studio at the time a lawful search warrant was to be executed. The issue is whether he was in the "immediate vicinity" of the studio as required for the application of the Summers rule under Bailey.

8

1. **Application of the Bailey Factors.**

When applying the Bailey factors to this case, it is clear that Defendant Jones was in the immediate vicinity of the Newtown Studio when he was detained. First, Defendant Jones was detained in a parking spot directly in front of the Newtown Studio. Though not located within the exclusive property limits of the studio itself, the parking spot was clearly connected to the premises.[4] The evidence at the suppression hearing showed that the parking area is shared by all of the businesses in the office building, including the Newtown Studio. Indeed, the proximity of the space to the studio suggests that it is one of the few preferred parking spaces for patrons of the studio. Therefore, Defendant Jones' close proximity to the lawful limits of the premises suggests that he was in the immediate vicinity.[5]

Second, Defendant Jones was certainly within the line of sight of the Newtown Studio. He was only 35 feet away from the curb leading to the studio's entryway and only 100 feet away from the studio's front door. From that vantage point, Defendant Jones could have easily observed the SWAT officers as they initiated the takedown and entered the studio. He could have interfered with the search by sending warning texts to the occupants inside the studio or by providing a get-away vehicle for occupants trying to escape. Defendant Jones also had a clear

---

[4] In its opposition brief, the Government argues that Defendant Jones' parking spot was "within the limits of the premises" because the studio's lease agreement granted the lessee access to the parking area in front of the Studio. Opp. Br., ECF No. 27, at 16. In support, the Government attached the deed of conveyance for the Newtown Studio. Id. at Ex. 8. The lease agreement is not attached. The portion of the deed provided does not clearly state that the relevant parking area is part of the "common elements appertaining to that unit." See id. at 1. Regardless, the Court finds that this factor is not dispositive to the application of the Summers rule in this case.

[5] Other courts have found that close proximity to the lawful limits of the premises is sufficient to constitute "immediate vicinity" when balanced against the other Bailey factors. See, e.g., United States v. Murray, No. 1:13cr134, 2014 WL 2531949, at *7 (N.D. Ga. June 5, 2014) (gravel driveway of neighboring property was in "immediate vicinity" under Bailey); United States v. Ruiz, No. EP-14cr868, 2014 WL 10183873, at *8 (W.D. Tex. Aug. 25, 2014) (390 feet away from residence was "immediate vicinity" under Bailey).

9

shot to harm the officers, whose backs were facing him as they moved toward the entrance of the studio.

Third, Defendant Jones was close enough to enter the Newtown Studio with relative ease. The studio entrance was 100 feet away and involved only one flight of stairs. Furthermore, even if Defendant Jones could not successfully enter the studio once the search commenced, he was certainly close enough to disrupt the search and threaten the officers, as explained above. Therefore, taken together, the Bailey factors show that Defendant Jones was in the immediate vicinity of the Newtown Studio where he "pose[d] a real threat to the safe and efficient execution of a search warrant[.]" Bailey, 568 U.S. at 201. Because there is no dispute that Defendant Jones was detained at the time a lawful search warrant was being executed, the Summers rule applies.

### 2. Defendant Jones' Detention Accords with the Rationale of the Summers Rule.

Contrary to Defendant Jones' claim, the underlying rationale for the Summers rule supports its application in this case. As discussed below, the intrusion on Defendant Jones' liberty was clearly "outweighed by the special law enforcement interests at stake." Bailey, 568 U.S. at 202.

#### a. Special law enforcement interests weighed heavily in favor of detaining Defendant Jones during the search of the Newtown Studio.

Among the three law enforcement interests identified in Summers – preventing flight, officer safety, and orderly completion of the search – officer safety was paramount in this case. The planned takedown of the Newtown Studio was an elaborate tactical operation involving approximately twenty law enforcement officers on the scene, multiple suspected drug dealers, and potentially high quantities of illegal drugs and other contraband. The takedown was also risky. Prior to executing the search, officers first had to arrest Everette in an open-air parking lot

during early evening hours when it was still light out. The parking lot was monitored by video surveillance inside the studio giving occupants therein prior notice of the officers' arrival. After arresting Everette, officers then had to secure two different entries to the studio, including two sets of external stairs. As Sergeant Minehan explained, "the whole time we were in the open-air takedown mode, I was worried about being exposed[.]" 4/13/2018 Hr'g Transcript ("Tr."), ECF No. 45, at 10:20–22.

Defendant Jones' presence at the scene only increased this risk. His minivan was parked in the officers' direct line of access to Everette and the entrance of the Newtown Studio. This meant that the officers would have to cross in front of the minivan, directly exposing themselves to Defendant Jones, in order to take down Everette. Furthermore, the officers knew that Defendant Jones had traveled with Everette that day; that they had arrived together; and they appeared to be at the studio for a coordinated purpose. The officers also knew that Defendant Jones had prior arrests for drug-related offenses. Therefore, Defendant Jones was not merely an unknown variable inserted into a high-stakes takedown operation; he was a potential threat. As Sergeant Minehan explained, the main reason for detaining Defendant Jones during the takedown operation was "to cover our backs." Tr. at 19:17–22. Given the circumstances, the Court finds that any reasonable law enforcement officer in that position would have made the same decision.

The remaining law enforcement interests – preventing flight and orderly completion of the search – also weighed in favor of detaining Defendant Jones. The Supreme Court explained in Bailey that these interests are related because they both seek to "preserve the integrity of the search by controlling those persons who are on the scene." Bailey, 568 U.S. at 198. In narcotics cases, the need for such control is heightened because the search may give rise to "sudden

11

violence or frantic efforts to conceal or destroy evidence." Summers, 452 U.S. at 702. This was certainly true here.

The execution of the search warrant for the Newtown Studio involved multiple phases: the open-air takedown of Everette; securing the premises; performing an additional protective sweep of the studio; and the investigative search. The success of each phase was critical to the success of the ultimate search. As noted above, Defendant Jones was in a prime position to disrupt the initial phases. If he attempted to flee, he could have disrupted the takedown of Everette. Defendant Jones also could have warned occupants inside the studio, triggering the destruction of evidence, or he could have provided a get-away vehicle for occupants trying to flee the scene. For all of these reasons, the officers needed "unquestioned command of the situation." Summers, 452 U.S. at 703. They could not risk leaving Defendant Jones' actions to chance.

        b.      <u>Defendant Jones had a sufficient connection to the premises to be searched</u>.

Despite these legitimate law enforcement objectives, Defendant Jones argues that he cannot be considered an "occupant" for purposes of the Summers rule because he had no connection to the premises to be searched; he just "happened to be near" there. Reply, ECF No. 31, at 7. According to Defendant Jones, without a connection to the premises, the intrusion on personal liberty is too substantial to fall within the scope of the rule. In support, Defendant Jones relies on two district court cases, one from the District of Utah and the other from the District of New Mexico: Panaderia La Diana, Inc. v. Salt Lake City Corp., 342 F. Supp. 2d 1013, 1042 (D. Utah 2004), aff'd sub nom. Trevizo v. Adams, 455 F.3d 1155 (10th Cir. 2006); and United States v. Lopez-Garcia, No. 13-1543, 2013 WL 10093411 (D.N.M. Dec. 13, 2013).

In La Diana, the plaintiffs brought a civil rights action against the city and police officers stemming from the execution of a search warrant at a bakery, during which police officers detained all of the owners, employees, and patrons who were present at the bakery at the time of the search. 342 F. Supp. 2d at 1016. In determining the reasonableness of the various detentions, the court found that "occupants" must be connected to the premises to be detained under the Summers rule; they cannot be mere passersby. Id. at 1041–42.

In Lopez-Garcia, Homeland Security Investigations executed a search warrant on a soccer store in a strip mall on suspicion of a fraudulent identification scheme. 2013 WL 10093411, at *1. The defendant in that case, who worked at a different store in the strip mall, happened to walk into the soccer store during the search, and he was detained. Id. at *2. The district court granted that defendant's motion to suppress on the grounds that his detention was not authorized under Summers because he was merely a "bystander caught up in a raid." Id. at *13.

At the outset, it appears that the courts in La Diana and Lopez-Garcia strayed from the Supreme Court's guidance that the Summers rule is categorical; "it does not require law enforcement to have particular suspicion that an individual is involved in criminal activity[.]" Bailey, 586 U.S. at 193 (citation omitted). Therefore, to the extent a connection-to-the-premises test is posited as a means of assessing suspicion or the extent of the intrusion on a case-by-case basis, this Court does not find any precedent supporting such a test.

Regardless, La Diana and Lopez-Garcia are distinguishable. Here, Defendant Jones was not a random patron of the Newtown Studio or a mere bystander caught up in a raid. At the time Defendant Jones was detained, he had been with Everette for at least three hours. They dined together at the Waffle House; they caravanned to Everette's Geneva Residence, which they

entered and exited at the same time; and then they caravanned to the Newtown Studio where they backed into parking spaces next to one another. This did not occur on a random day but on a day when law enforcement scheduled a controlled heroin buy from Smith, and expected Everette to deliver heroin to Smith at the studio. Therefore, Defendant Jones' coordinated and simultaneous arrival at the Newtown Studio with Everette gave Defendant Jones a clear connection to the premises to be searched and to the criminal activity suspected therein.

In sum, the Court finds that the Summers rule applies here. Defendant Jones was in the immediate vicinity of the Newtown Studio at the time a lawful search warrant was to be executed there. Therefore, his detention during the pendency of that search was lawful.

### C. Defendant Jones' Detention Was Lawful under Terry.

As a secondary justification for Defendant Jones' detention, the Government argues that his detention was independently supported by reasonable suspicion that Defendant Jones was involved in a drug crime, and therefore his detention was lawful under Terry. The Government also argues that the detention remained lawful through the time of the K-9 sniff of his vehicle. The Court agrees.

#### 1. Applicable Law

In Terry, the Supreme Court established the "now-familiar standard" that a brief investigatory stop by police is permissible only if "the officer's action is supported by a reasonable and articulable suspicion, under all the circumstances, that criminal activity 'may be afoot.'" United States v. Bumpers, 705 F.3d 168, 171 (4th Cir. 2013) (quoting Terry, 392 U.S. at 19)). There must be "particularized suspicion" that the person has committed or is about to commit a crime; mere "presence in an area of expected criminal activity . . . is not enough[.]'" Id. at 171–72 (quoting Illinois v. Wardlow, 528 U.S. 119, 124 (2000)). But "the quantum of proof necessary to demonstrate reasonable suspicion is considerably less than a preponderance of

the evidence." United States v. Branch, 537 F.3d 328, 336 (4th Cir. 2008) (internal quotation omitted).

Furthermore, when an investigative detention is permitted under Terry, "[t]he scope of the detention must be carefully tailored to its underlying justification." Florida v. Royer, 460 U.S. 491, 500 (1983). Therefore, the detention "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." Id. "Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." Id.

### 2. The Officers Had Reasonable Suspicion as to Defendant Jones.

Defendant Jones argues that law enforcement lacked reasonable suspicion "particularized to him" to justify his detention. Reply, ECF No. 31, at 13. He emphasizes that his mere association with Everette and presence in the parking lot of the Newtown Studio are not enough to suspect that Defendant Jones was involved in a drug crime, particularly given that Defendant Jones was previously unknown to the officers, he was not a person of interest in the investigation, and the officers had not witnessed any exchange of words or items between Defendant Jones and Everette to suggest that Defendant Jones was involved in drug activities. Id. at 11–12, 15. The Court disagrees.

Although it is true that Defendant Jones was unknown to the investigators prior to October 19, 2017, his activities that day and the context in which they occurred unquestionably generated a reasonable suspicion particularized to Defendant Jones that he was involved in a drug crime. First, Defendant Jones had accompanied Everette, a suspected heroin dealer, for at least three hours that day. Defendant Jones not only ate with him at a Waffle House, he then followed him to the Geneva Residence, went inside for some time, and then followed Everette to the Newtown Studio. While the Waffle House was a seemingly innocent location, the second

15

two locations were not. At the time Defendant Jones followed Everette to the Geneva Residence and the Newtown Studio, Detective Riddick had secured search warrants for both locations, which demonstrated that a state judicial officer found probable cause to believe that criminal drug activity was occurring in both locations.

Second, Defendant Jones' activities with Everette that day fit a known pattern of drug activity. During three prior controlled buys at the Newtown Studio, (i) the CI had arranged a controlled heroin purchase from Smith; (ii) prior to such purchase, Everette and another companion traveled from the Geneva Residence to the Newtown Studio; and (iii) after Everette left the Newtown Studio, Smith informed the CI that the heroin was ready for purchase. Similarly, on October 19, 2017, the CI had arranged a controlled purchase of heroin from Smith, and prior to such transaction, Everette and Defendant Jones traveled together from the Geneva Residence to the Newtown Studio. Given Everette's pattern, it was reasonable to suspect that Defendant Jones was accompanying Everette that day to assist in a drug transaction.

Third, Defendant Jones engaged in behaviors that the officers reasonably associated with illegal drug activity. He accompanied a suspected drug dealer to a place where drug transactions had previously occurred, and upon their arrival, they both backed their vehicles into parking spaces. Detective Riddick testified that this parking tactic is common during drug deals because it is easier to escape the scene. Tr. at 135:10–17. He also testified that it is common for drug dealers to have a companion during a drug transaction to act as a look-out or a body guard.[6] Id. at 110:16–21. Standing alone, these factors are "seemingly innocent," but when considered in the broader context, they formed part of the officers' reasonable suspicion here. United States v. Foster, 824 F.3d 84, 89 (4th Cir. 2016).

---

[6] "[I]t is entirely appropriate for courts to credit 'the practical experience of officers who observe on a daily basis what transpires on the street.'" Branch, 537 F.3d at 336–37 (internal citation omitted).

Lastly, before Defendant Jones had arrived at the Newtown Studio, the officers learned that he has an extensive arrest record, including multiple arrests for drug-related offenses. Defendant Jones argues that "a person's 'prior criminal record, is not, standing alone, sufficient to create reasonable suspicion.'" Reply, ECF No. 31, at 13 (quoting United States v. Foster, 634 F.3d 243, 246 (4th Cir. 2011)). But Defendant Jones' arrest record did not stand alone. When considered among the many factors discussed above, his record added to the likelihood that Defendant Jones was accompanying Everette to assist in a drug crime.

For all of these reasons, the Court finds that, at the time of Defendant Jones' detention, the officers had reasonable suspicion that he was involved in a drug crime. Therefore, Defendant Jones' detention was lawful under Terry.

### D. Defendant Jones' Detention Was Not Unreasonably Prolonged.

Defendant Jones argues that, even if his initial detention were lawful, the detention had been prolonged beyond its permissible scope by the time the K-9 sniff of his vehicle occurred. Reply, ECF No. 31, at 16. This claim is also without merit.

As an initial matter, Defendant Jones' detention was lawful pursuant to the Summers rule, as discussed previously. See supra Part II.B. Pursuant to this rule, the officers were permitted to detain Defendant Jones for as long as reasonably necessary to execute the search of the Newtown Studio in a safe and efficient manner. See Muehler, 544 U.S. at 99. The K-9 sniff occurred at 6:06 p.m., just after the protective sweep of the studio had concluded. The investigative phase of the search followed and lasted approximately two to three hours. The special law enforcement interests at stake did not dissipate upon securing the premises. The premises had to remain secure and the search uninterrupted, especially as several officers were coming and going from the Newtown Studio during the turnover between the protective sweep and the investigative phase. Because the K-9 sniff occurred during this turnover, Defendant

17

Jones' detention was certainly not prolonged at that time.

Notwithstanding the Summers rule, however, the Court still finds that Defendant Jones' detention was reasonable in scope and duration. The sniff of Defendant Jones' vehicle by a narcotics detection dog was related to the officer's reasonable suspicion that Defendant Jones had committed or was about to commit a drug crime. Furthermore, the K-9 sniff occurred within the time reasonably required to complete the mission of Defendant Jones' stop. In this case, Detective Kagel and the narcotics K-9, Rex, were already positioned near the scene to assist with the investigative search of the studio. However, they could not approach the studio until the protective sweep was complete and the premises were secured. Defendant Jones was detained shortly after 5:45 p.m., and the protective sweep of the studio was complete approximately fifteen minutes later. Detective Kagel and Rex conducted the sniff screen at 6:06 p.m., within minutes of receiving the "all clear" signal. Therefore, the brief delay between Defendant Jones' initial detention and the K-9 screen was strictly a result of the officers' reasonable safety measures in the context of highly complex tactical operation. For these reasons, the Court finds that Defendant Jones was lawfully detained when the K-9 screen of his van was conducted.

E.   **The Search of Defendant Jones' Vehicle Was Supported by Probable Cause.**

Lastly, the Court finds that the officers had probable cause to search Defendant Jones' vehicle because the search occurred after the K-9 alerted for the presence of narcotics in the vehicle. The Fourth Circuit has been clear that a drug detection dog's positive alert on a vehicle provides probable cause to search that vehicle. United States v. Kelly, 592 F.3d 586, 592 (4th Cir. 2010). Therefore, the search of Defendant Jones' minivan was lawful.[7]

---

[7] Defendant Jones initially challenged the reliability of the K-9 alert in this case because the Government had purportedly not provided any documentation showing that Rex was trained or certified in performing drug screens. See Mot. to Suppress, ECF No. 21, at 11. However, as part of its opposition brief, the Government submitted certification from the Virginia Police Work Dog Association, dated April 27,

## III. CONCLUSION

For the foregoing reasons, the Court found that Defendant Jones' detention and search of his vehicle on October 19, 2017, were lawful. Therefore, Defendant Jones' Motion to Suppress was **DENIED**. ECF No. 21.

The Clerk is **DIRECTED** to forward a copy of this Opinion to all Counsel of Record.

**IT IS SO ORDERED.**

/s/
Robert G. Doumar
Senior United States District Judge
UNITED STATES DISTRICT JUDGE

Norfolk, VA
May 4, 2018

---

2017, showing that Detective Kagel and Rex had received their annual certification for Rex to perform sniff screens for marijuana, cocaine, heroin, methamphetamines, and ecstasy as of the date of the alert in this case. Opp. Br. at Ex. 2, ECF No. 27-2. In his Reply, Defendant Jones did not raise any further objections to Rex's certification or the reliability of his alert. ECF No. 31. Therefore, the Court assumes this objection is withdrawn. In any event, the Court finds that the Government has submitted sufficient evidence to establish the reliability of Rex's positive alert of Defendant Jones' minivan.